FILED
CLERK

JGK 03/02/2018
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
UNITED STATES OF AMERICA,       : 18-CR-00021-ADS-AYS
                                :
      - versus -                : U.S. Courthouse
                                : Central Islip, New York
DANIEL ARNOLD,                  :
                   Defendant    : February 12, 2018
------------------------------X
```

## S E A L E D   P R O C E E D I N G S

TRANSCRIPT OF CRIMINAL CAUSE FOR PLEADING
BEFORE THE HONORABLE ANNE Y. SHIELDS
UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**


**For the Government:**          **Richard P. Donoghue, Esq.**
                                 United States Attorney

                          BY:    **Alister Reiter, Esq.**
                                 Assistant U.S. Attorney
                                 100 Federal Plaza
                                 Central Islip, NY 11722


**For the Defendant:**           **Leonard Leto, Esq.**
                                 200 Motor Parkway
                                 Suite C-17
                                 Hauppauge, NY 11788


**Transcription Service:**       **Transcriptions Plus II, Inc.**
                                 61 Beatrice Avenue
                                 West Islip, NY 11795
                                 laferrara44@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  Calling 18-cr-21, United States of
2  America v. Daniel Arnold.

3          Please state your appearances for the record.

4          MR. REITER:  Good afternoon, your Honor.

5          Trial Attorney, Alister Reiter (ph.) for the
6  United States.  With me is U.S. Postal Inspection Service
7  Agent, Christine Collin (ph.).

8          THE COURT:  Good afternoon.

9          MR. LETO:  Leonard Leto for Mr. Arnold.

10         Good afternoon.

11         MR. LETO:  And good afternoon, your Honor.

12         Tracey Gaffey, Federal Defenders for Mr.
13  Arnold.

14         THE COURT:  Good afternoon.

15         All right.  We're here today for a proceeding
16  pursuant to Rule 7(b) of the Federal Rules of Criminal
17  Procedure.  First I want to make sure that Mr. Arnold
18  understands, Judge Spatt is the district judge in this
19  case.  He is the judge that will ultimately be handling
20  and sentencing you in this matter.  You understand he's
21  referred this matter to me here this afternoon and at the
22  end, I'll be making a recommendation to him as to whether
23  or not to accept what happened in the courtroom today.

24         Do you understand that?

25         THE DEFENDANT:  Yes, I understand.

3

Proceedings

1          THE COURT:  Okay.  All right.  So you are going
2   to be waiving indictment and pleading guilty to Count 1
3   of an information that charges you with conspiracy to
4   commit mail fraud.
5          So the first thing I have here is a waiver of
6   indictment.  I want to talk to you about that first, Mr.
7   Arnold.  Okay?
8          THE DEFENDANT:  Okay.
9          THE COURT:  The first thing we're going to do
10  is swear you in.  I'm going to ask my deputy -- just
11  stand up -- you just stand up, raise your right hand and
12  answer yes.
13  D A N I E L  A R N O L D
14     called as a witness, having been first duly sworn,
15     was examined  and testified as follows:
16          THE COURT:  Okay.  You can be seated.  Now when
17  we speak, just make sure you speak into the mic, that the
18  green light is on, okay, because everything is recorded.
19  Okay?
20          All right.  So first of all, can you state your
21  full name to me?
22          THE DEFENDANT:  Daniel Arnold.
23          THE COURT:  And have you had the opportunity to
24  discuss these proceedings here today with your lawyer?
25          THE DEFENDANT:  Yes.

4

Proceedings

1           THE COURT:  And you understand what's going on?

2           THE DEFENDANT:  Yes.

3           THE COURT:  Okay.  So first of all, as to the

4    waiver of indictment, I do have the form in front of me

5    here.  I just want to explain to you on the record, your

6    right to be indicted, so I can be sure that you

7    understand what that means.  All right?

8           So when the government prosecutes somebody for

9    an offense that is punishable by a term of imprisonment

10   that exceeds one year, they have to do so by indicting

11   the person.  In fact, you have a constitutional right to

12   be charged by indictment of a grand jury.  That means

13   unless you waive indictment, you cannot be charged with a

14   felony unless a grand jury finds there's probable cause

15   to believe that a crime was committed and you committed

16   it.

17          If you don't waive indictment, the government

18   has to present its case to a grand jury if it wants to

19   proceed.  If that were to happen, the case would be

20   presented to a group of your fellow citizens who sit on

21   the grand jury to determine probable cause.

22          Upon that presentation, the grand jury may or

23   may not indict you.  However, you can waive the right to

24   indictment and you can allow the government to proceed

25   against you by way of information and that's what we're

5

Proceedings

1    doing here today.

2              If you waive indictment, which you have done,

3    the government is allowed to proceed against you by way

4    of information.

5              Do you understand what I have explained to you

6    about the grand jury process and having discussed that,

7    do you agree to waive indictment by the grand jury?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Okay.  So you've signed it.  Your

10   lawyer has signed it and I will sign that as well, okay?

11   So that's taken care of.  And I am going to recommend

12   that the district court accept that waiver.

13             Now we're proceeding to the guilty plea.  I

14   want to remind you that you're already sworn in, all

15   right?  All right.

16             Now before you came in today, you discussed the

17   guilty plea with your lawyer, right?

18             THE DEFENDANT:  Yes.

19             THE COURT:  And he provided you with a form and

20   you've gone over that form and you've filled out all of

21   the answers, right?

22             THE DEFENDANT:  Yes.

23             THE COURT:  All right.  So all we're going to

24   do is go through that form and I'm going to ask you the

25   same questions and ask you to respond the same way, okay?

6

Proceedings

1          THE DEFENDANT:  Okay.

2          THE COURT:  So you understand that having been

3  sworn in and your answers to my questions are subject to

4  the penalty of perjury or of making a false statement if

5  answer untruthfully.

6          THE DEFENDANT:  Yes.

7          THE COURT:  Do you understand that?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Okay.  Again, state your full name.

10          THE DEFENDANT:  Daniel Arnold.

11          THE COURT:  And how old are you?

12          THE DEFENDANT:  Fifty-six.

13          THE COURT:  Are you a citizen of the United

14  States?

15          THE DEFENDANT:  Yes.

16          THE COURT:  What is the highest grade of school

17  or education that you have had?

18          THE DEFENDANT:  College, four-year college.

19          THE COURT:  Are you presently or have you

20  recently been under the care of a physician or a

21  psychologist?

22          THE DEFENDANT:  No.

23          THE COURT:  In the past 24 hours, have you

24  taken any narcotic drugs, medicine or pills or drunk any

25  alcoholic beverage?

7

Proceedings

1          THE DEFENDANT:  No.

2          THE COURT:  Have you ever been hospitalized or

3  treated for narcotics addiction?

4          THE DEFENDANT:  No.

5          THE COURT:  Is your mind clear?

6          THE DEFENDANT:  Yes.

7          THE COURT:  And you understand what is going on

8  here?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Okay, turning to Mr. Leto, have you

11  discussed this matter with your client?

12          MR. LETO:  Yes.

13          THE COURT:  And do you believe he understands

14  the rights that he will be waiving by pleading guilty

15  today?

16          MR. LETO:  Yes.

17          THE COURT:  Do you believe he is capable of

18  understanding the nature of these proceedings?

19          MR. LETO:  Yes.

20          THE COURT:  And do you have any doubt about his

21  competency to plead at this time?

22          MR. LETO:  No.

23          THE COURT:  Turning back to Mr. Arnold.  You

24  have a right to plead not guilty.

25          Do you understand that?

8

                              Proceedings

1          THE DEFENDANT:  Yes.

2          THE COURT:  If you plead not guilty, under the

3    Constitution and laws of the United States, you are

4    entitled to a speedy and public trial by jury with the

5    assistance of counsel on the charge.

6          Do you understand that?

7          THE DEFENDANT:  Yes.

8          THE COURT:  At the trial, you would be presumed

9    to be innocent and the government would have to overcome

10   that presumption and prove you guilty by competent

11   evidence, and beyond a reasonable doubt and you would not

12   have to prove that you are innocent.  And if the

13   government failed, the jury would have the duty to find

14   you not guilty.

15         Do you understand that?

16         THE DEFENDANT:  Yes.

17         THE COURT:  In the course of the trial, the

18   witnesses for the government would have to come to court

19   and testify in your presence.  And your lawyer would have

20   the right to cross-examine the witnesses for the

21   government, to object to evidence offered by the

22   government and to offer evidence on your behalf.

23         Do you understand that?

24         THE DEFENDANT:  Yes.

25         THE COURT:  At the trial, while you would have

9

Proceedings

1   the right to testify if you chose to do so, you would not

2   be required to testify.  Under the Constitution of the

3   United States, you cannot be compelled to incriminate

4   yourself.  If you decided not to testify, the Court would

5   instruct the jury that they could not hold that against

6   you.

7           Do you understand that?

8           THE DEFENDANT:  Yes.

9           THE COURT:  If you plead guilty and the

10  district court accepts the plea, you will be giving up

11  your constitutional right to a trial and the other rights

12  that I have discussed.  There will be no further trial of

13  any kind and no right to appeal or collaterally attack at

14  any time the question whether you are guilty or not.  A

15  judgment of guilty will be entered on the basis of your

16  guilty plea, which judgment can never be challenged.

17  However, you will have the right to appeal with respect

18  to your sentence.

19          Do you understand that?

20          THE DEFENDANT:  Yes.

21          THE COURT:  If you plead guilty, I am going to

22  ask you questions about what you did in order to satisfy

23  myself that you are indeed guilty of the charge to which

24  you seek to plead guilty.  And you will have to answer

25  any questions and acknowledge your guilt.  Thus, you will

10

Proceedings

1    be giving up your right not to incriminate yourself.

2              Do you understand that?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Are you willing to give up your

5    right to a trial and the other rights I have discussed?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Okay.  Turning to the government, I

8    would like you to outline for me any agreement that you

9    have concerning the plea and the sentence here.

10              MR. REITER:  Thank you, your Honor.  Your

11   Honor, the government would move to seal the transcript

12   and docket in this case pending further motions.

13              THE COURT:  Is that agreed upon?

14              MR. LETO:  Yes.

15              THE COURT:  Okay.  Not a problem.

16              MR. REITER:  Thank you, your Honor.  The

17   government here has promised not to prosecute Mr. Andrews

18   (sic) for previously disclosed participation in criminal

19   activity involved deceptive mass mailings from October

20   21st, 2012 to October 21st 2017.  There is no agreement,

21   however, made on sentencing.

22              THE COURT:  No agreement as to sentencing?

23              MR. REITER:  No.

24              THE COURT:  What about as to a 5k letter?

25              MR. REITER:  Your Honor, we haven't discussed

11

Proceedings

1  the specifics of that.  Mr. Arnold is being asked to be a

2  continuing cooperator with regards to some ongoing

3  investigations.

4          MR. LETO:  Well, that could be misleading to

5  Mr. Arnold.  I know what Mr. Reiter is saying but I want

6  to make Mr. Arnold aware of what his -- he means by that.

7          THE COURT:  Okay.

8          MR. LETO:  There is an agreement by virtue of

9  the cooperation agreement that if Mr. Arnold, okay,

10  complies with the cooperation agreement with its

11  provisions, the government at the time of sentencing will

12  file a 5k letter with the district judge.  It is

13  obviously -- it's the government's sole discretion, of

14  course they must act in good faith, whether to file the

15  letter but at this juncture, since Mr. Arnold's

16  cooperation is not complete, the government is not in a

17  position to say whether it will file such a letter.

18  They're just entering into a contract with Mr. Arnold

19  that if Mr. Arnold lives up to his end of the bargain and

20  complies with the agreement, the government will file

21  that letter at the time of sentencing.

22          THE COURT:  Thank you for clarifying.

23          MR. REITER:  Your Honor, the only thing I would

24  add to that is that the 5k letter will be contingent on

25  substantial assistance -- the 5k letter would be

12

Proceedings

1  contingent on substantial assistance.

2          THE COURT:  I think what Mr. Leto has done is

3  put on the record exactly what's in the cooperation

4  agreement.  Am I right?

5          MR. LETO:  Yes.

6          THE COURT:  Okay.

7          MR. REITER:  Thank you.

8          THE COURT:  And in terms of appeal, there's no

9  waiver of an appeal, correct?

10          MR. REITER:  There's no waiver of appeal, your

11  Honor.

12          THE COURT:  Okay.  All right.  Sticking with

13  the government, the elements of the crime that the

14  defendant is pleading guilty to.

15          MR. REITER:  Yes, your Honor.  There's an

16  agreement to engage in fraudulent acts involving

17  astrology and sweepstake solicitations.  That there was a

18  use of the mails for the purpose of executing the

19  fraudulent acts.  That there was a conspiracy between the

20  defendant and other unnamed co-conspirators between, in

21  or about January of 2012 and September of 2016, that the

22  defendant joined the conspiracy agreement knowingly and

23  intentionally and as Mr. Leto helpfully put in the plea

24  form, that the parts of the conspiracy occurred in the

25  Eastern District of New York.

Proceedings

1          THE COURT:  Okay.  Turning back to Mr. Arnold,

2    are you aware of the elements of the crime that you are

3    charged and to which you intend to plead guilty?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Okay.  And have you discussed with

6    your lawyer that charge?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Do you understand the charge?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Do you know the maximum term and

11   the fine that the Court can impose on the charge to which

12   you are pleading guilty?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Okay.  So the maximum possible

15   penalty to this crime is twenty years in jail and a fine

16   of $250,000 or twice the gross loss or gross gain.

17         Do you understand that?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Do you also understand there's a

20   mandatory $100 special assessment?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Do you also understand the Court

23   can order restitution?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Do you also realize that if jail

14

Proceedings

1   time is imposed, there  may be a period of up to three

2   years of supervised release?

3             THE DEFENDANT:  Yes.

4             THE COURT:  Okay.  And that's not mandatory,

5   that's up to the district court in this case?

6             MR. LETO:  Correct, your Honor.

7             THE COURT:  Okay.  Back to Mr. Arnold, have you

8   discussed the sentencing guidelines with your lawyer?

9             THE DEFENDANT:  Yes.

10            THE COURT:  Do you understand that those

11  guidelines are not mandatory but that in sentencing, the

12  Court is required to consider the applicable guideline

13  range, the statutory factors listed in 18 USC 3553(a),

14  the nature and circumstances of the offense and your

15  history and characteristics, including, if any, your

16  criminal history?

17            THE DEFENDANT:  Yes.

18            THE COURT:  I am going to read you what those

19  statutory factors are.  The Court must impose a sentence

20  sufficient but not greater than necessary to reflect the

21  seriousness of the offense, to promote respect for the

22  law, to provide just punishment for the offense, to

23  afford deterrence as to other criminal conduct, to

24  protect the public from further crimes by you and to

25  provide you with needed educational or vocational

15

Proceedings

1  training, medical care or other correctional treatment in

2  the most effective manner.

3           At the sentencing, the Court must also consider

4  your cooperation if the government submits a 5k1.1

5  letter.

6           Do you understand that?

7           THE DEFENDANT:  Yes.

8           THE COURT:  Has your attorney explained these

9  factors to you?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Do you realize that if the sentence

12  is more severe than what you might expect, you will be

13  bound by your guilty plea and will not be permitted to

14  withdraw it?

15          THE DEFENDANT:  Yes.

16          THE COURT:  And again, there's no agreement as

17  to particular recommendations on sentencing here.

18          MR. LETO:  Correct, your Honor.

19          THE COURT:  Okay.  Do you have any questions

20  that you would like to ask me about the charge, your

21  rights or anything else relating to this matter?

22          THE DEFENDANT:  No.

23          THE COURT:  Are you ready to plead?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Okay.  Turning back to Mr. Leto, do

16

Proceedings

1   you know of any reason why this defendant should not

2   plead guilty?

3                MR. LETO:  No, your Honor.

4                THE COURT:  Turning back to Mr. Arnold.  Are

5   you satisfied with your legal representation up until

6   this point?

7                THE DEFENDANT:  Yes.

8                THE COURT:  And do you believe that your lawyer

9   done a good job for you?

10               THE DEFENDANT:  Yes.

11               THE COURT:  What is your plea, guilty or not

12  guilty?

13               THE DEFENDANT:  Guilty.

14               THE COURT:  Are you making this plea

15  voluntarily and of your own free will?

16               THE DEFENDANT:  Yes.

17               THE COURT:  Has anybody threatened you or

18  forced you to plead guilty?

19               THE DEFENDANT:  No.

20               THE COURT:  Other than the agreement with the

21  government, and that's the cooperation agreement we

22  talked about before, has anyone made any promises that

23  are causing you to plead guilty?

24               THE DEFENDANT:  No.

25               THE COURT:  Has anybody made you any promise to

17

Proceedings

1  you as to what your sentence will be?

2       THE DEFENDANT:  No.

3       THE COURT:  All right.  So now what I want you

4  to do is to describe in your own words what you did in

5  connection with the acts charged and that is one count in

6  the information that you're pleading guilty to, and

7  that's conspiracy to commit mail fraud.

8       MR. LETO:  Your Honor, if I may just have a

9  moment to explain.

10      THE COURT:  Sure.

11      MR. LETO:  Because this is a cooperation

12 agreement, Mr. Arnold and Mr. Reiter and I discussed this

13 at length.  We thought it best to write out, go over it

14 with Mr. Arnold this morning and if it's all right with

15 your Honor, Mr. Arnold will read from this, obviously

16 subject to any questions he may have.  And if that's okay

17 with the Court, may he also remain seated because he is

18 somewhat nervous.

19      THE COURT:  That's absolutely fine.  You can

20 read from it.  Let me just before you do so, what your

21 lawyer said, I am sure these are your words and you've

22 discussed it and I'm perfectly comfortable with you

23 sitting and reading.  That's fine.

24      MR. LETO:  All right.

25      THE COURT:  You can go ahead.  Take your time.

Proceedings

1          THE DEFENDANT:  Okay.  In 2012, I became one of

2     four equity partners in RM --

3          THE COURT:  When I said take your time, I meant

4     it.  Speak slowly.

5          THE DEFENDANT:  All right.  Okay.  I'll start

6     again.

7          THE COURT:  Okay.

8          THE DEFENDANT:  In 2012, I became one of four

9     equity partners in RMI Direct Marketing, a direct mail

10    list brokerage company in Connecticut.  At RMI, I led the

11    list brokerage practice that focused on astrology and

12    sweepstakes, mailings and lists.

13          RMI's primary function in connection with

14    mailing campaigns was to provide lists of addresses and

15    names for mailers in the United States and Canada.  When

16    I acted as a list broker, our clients were mailers who

17    created content and used RMI to obtain lists of customers

18    to whom to send the mailings.

19          When RMI served as a list manager, as opposed

20    to a list broker, we helped list owners rent their lists

21    to other mailers.  We also found other brokers

22    representing other mailers who rented our client's lists.

23          I was aware that in connection with

24    transactions that I facilitated, some of the content in

25    some of the mailings was deceptive.  Although I did not

19

Proceedings

1    see content in every transaction because some

2    transactions were handled by employees, I knew that my --

3    that the content in many mailings including those that

4    were addressed on Long Island were deceptive.

5            The sweepstakes mailings were deceptive because

6    they  made the customer believe that if he or she mailed

7    a processing fee, the customers was guaranteed to win a

8    sum of money or some other valuable price which was not

9    the case.

10           The astrology mailings were deceptive because

11   for a processing fee, they claimed to give the recipient

12   a personalized astrology reading which I knew to be

13   untrue.  The astrology mailings also often misleadingly

14   promised large sums of money and prizes.

15           For a portion of my career at RMI, my larger

16   client was a mailer and list owner known as the Destiny

17   Research Center.  I acted as its list broker, renting

18   lists for its astrology mailings.  I also served as its

19   list manager, renting Destiny's list to other mailers

20   with similar solicitations.  I knew that many of

21   Destiny's mailings claimed content claiming to be from

22   world-renowned psychics and that the content falsely

23   stated that the consumer was being contacted because he

24   or she had been the subject of visions of the psychics in

25   which the consumer would receive large sums of money in

20

Proceedings

1    lotteries or by other means.

2         THE COURT:  Thank you.  Let me ask the

3    government if you could outline the proof that you would

4    have put forward at trial.

5         MR. REITER:  Thank you, your Honor.  Were the

6    government to go to trial, the government would prove

7    beyond a reasonable doubt that the defendant, Mr. Arnold,

8    acted for years as the direct agent and middle man for

9    mailing campaigns with tens of millions of deceptive

10   mailings sent to consumers throughout the United States

11   and overseas.

12        Defendant worked directly with these co-

13   conspirators who created fraudulent mailings and sent

14   them using lists of names that were procured and

15   recommended by the defendant.  The defendant knowingly

16   facilitated the mailing of millions of solicitations

17   which were intended to fraudulently induce victims to

18   send money to the unnamed co-conspirators.  These

19   solicitations were often either an astrological-based

20   scams or a fraudulent sweepstakes.

21        These astrological scams involved solicitations

22   supposedly from world-renowned psychics that falsely

23   claimed the victims were being contacted because they had

24   been the subject of a personalized specific vision by the

25   psychic, that the victim was due to receive large sums of

21

Proceedings

1  money and lotteries or other means.

2          Those solicitations particularly appeared

3  personalized, referring to victims by their first names

4  and portions that falsely appeared to be handwritten to

5  give the appearance of an individualized letter.

6          The government would prove that the defendant

7  knew that these mass mailings, for which he identified

8  thousands of names at a time, were in fact fraudulent.

9          The sweepstakes scam that the defendant

10 facilitated by either renting names or finding names to

11 mail were deceptive because they intentionally mislead

12 recipients into believing they had also received a large

13 cash lottery or sweepstakes prize, when in fact it was a

14 mass mailing intended to solicit processing fees under

15 false pretenses.

16         The government would prove beyond a reasonable

17 doubt at trial that the defendant had knowledge that the

18 schemes in question were deceptive and materially

19 misleading to consumers and that he knew that many

20 thousands of consumers were sending money to co-

21 conspirators based on the false representations in these

22 mailings.

23         THE COURT:  And how would you prove the

24 defendant's involvement in all this?

25         MR. REITER:  Your Honor, the government's proof

22

Proceedings

would include copies of sample deceptive solicitations
that were both emailed by and received by the defendant,
as well as examples of the defendant approving the rental
of names for deceptive solicitations after receiving a
copy of the deceptive solicitation.  The solicitations
are often fraudulent on their very face where they state
that they're individualized, personalized letter but the
defendant would know that it was, in fact, sent to 5,000,
10,000 or a larger number of victims.

            THE COURT:  And this would be the defendant's
email?

            MR. REITER:  Yes, your Honor.  And the
defendant also at times received solicitations after they
were mailed, as he inserted a decoy address into the
lists of names that were being mailed, so that he could
receive a copy of the solicitation after it was sent out.
So the defendant would have received an actual copy of it
and we have copies of those, as well.  That would be
among other proof, your Honor, put forward by the
government.

            The defendant's largest client for years was a
scheme named the Destiny Research Center which is a
corporation incorporated in Hong Kong which sent millions
of fraudulent solicitations in the United States and
elsewhere.  The defendant as a list broker for the

23

Proceedings

1  Destiny Research scheme, recommending and identifying

2  millions of names for the fraudulent mailing schemes and

3  he did this by soliciting lists of names from other

4  clients who would engage in fraud, and from other list

5  owners that he knew had lists likely to be good sources

6  of recipients or victims for the Destiny Research scheme.

7            He also acted as a list manager, meaning that

8  he managed lists for clients including the Destiny

9  Research Center.  As a list manager, he kept tabs on how

10  many consumers have paid into an individual scheme, such

11  as Destiny Research and then rented these names to other

12  fraudsters on behalf of his client, such as a Destiny

13  Research scheme and Mr. -- defendant's company received

14  commissions based on the number of names that he brokered

15  or managed for his clients.

16            THE COURT:  And defendant's position in that

17  company was what?

18            MR. REITER:  He was an equity partner, your

19  Honor, one of four equity partners.

20            THE COURT:  Okay.  Mr. Leto?

21            MR. LETO:  Yes.  Just even for Mr. Arnold's

22  benefit because that was a lot to swallow just to maybe

23  put it in some simpler terms to what really happened here

24  is that fraudulent mailings were sent by companies that

25  just defrauded people but these companies needed names of

24

Proceedings

1  people who would fall for the scam.

2          Mr. Arnold did not make any mailings.  That was

3  not his role.  However, in the business out there, people

4  actually make money renting the lists, just like for

5  instance, Lands End has a list of name.  LL Bean might

6  want that list because they're similar customers.

7          So what Mr. Arnold did was he facilitated these

8  mailings and therefore entered the conspiracy because

9  these fraudulent mailings were going out.  Mr. Arnold

10  knew that a lot of these mailings were going to, for want

11  of a better term, deceive people and take their money --

12          THE COURT:  Right.

13          MR. LETO:  -- rip them off.  And despite

14  knowing that, he supplied the names and then, in fact,

15  these companies ripped them out.  So he didn't directly

16  rip them off but what he did was he facilitated it.  He

17  gave these companies the means to do what they did and

18  that makes him guilty --

19          THE COURT:  Right, which is sufficient to make

20  him guilty of conspiracy.

21          MR. LETO:  Yes, and the government has the

22  proof, as Mr. Reiter points out, with the emails and the

23  decoys and so forth, that Mr. Arnold knew that this, in

24  fact, was happening.

25          THE COURT:  Right.  And the government, when I

25

Proceedings

1  asked to outline your proof, I didn't mean, you know,

2  what the final -- what everything would show.  The

3  question was how would you show, what sort of proof would

4  you offer to show that this defendant was guilty of the

5  conspiracy to commit mail fraud and I think you've done

6  that through the emails, is that right?

7           MR. REITER:  Yes, your Honor.

8           THE COURT:  And his position with the company,

9  is that right?

10          MR. REITER:  Yes, your Honor.  There are a

11  number of emails from Mr. Arnold where he forwards on

12  deceptive solicitations.

13          THE COURT:  So just so we're all clear, you

14  know, Mr. Arnold, you've heard what your lawyer says

15  about your involvement.  You've also discussed with me

16  your involvement and indeed, your knowledge that these

17  lists were used for emails that were deceptive, not all

18  of them but some of them, understood?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Okay.  And Mr. Leto, having heard

21  what the government said it would outline as its proof at

22  trial, you're still comfortable with your client pleading

23  guilty to conspiracy to commit mail fraud?

24          MR. LETO:  I am, your Honor.  And just the term

25  that Mr. Reiter used, a decoy, I just want to elaborate

26

Proceedings

1   on that because when I entered this case, I had never

2   heard what that meant and I asked Mr. Reiter and his

3   partner in the case, Erin Reynolds (ph.) to tell me what

4   it meant.

5           A decoy is that the company to whom say you're

6   renting a list, you want to make sure that they are, in

7   fact, sending out these promotions.  so what you do is

8   you provide a fake name but it comes back to your

9   personal residence.  So you can then find out whether, in

10  fact, the company is doing what it says and sure enough,

11  decoys Mr. Arnold sent out, he was getting at least some

12  of the solicitations sent to his house.  Obviously, he

13  didn't send in any money.  But it was his way of

14  confirming that this had happened in some cases and the

15  government has the proof to show the decoys, some of them

16  at least, of a deceptive nature, not all went to Mr.

17  Arnold's house.  So that is what meant by a decoy.

18          THE COURT:  Right.  And that would connect him?

19          MR. LETO:  Yes.

20          THE COURT:  Understood.  Anything else that

21  either the government or Mr. Leto that you want to add?

22          MR. LETO:  Not with respect to the plea, your

23  Honor, but let me just check with Mr. Arnold.

24          THE COURT:  Okay.

25          MR. LETO:  Is there anything else that you want

27

Proceedings

1  me to add?

2  (Counsel and client confer)

3          MR. LETO:  May I just have a moment with Mr.

4  Reiter?

5          THE COURT:  Absolutely.

6  (Counsel confer)

7          MR. LETO:  Nothing further, your Honor, with

8  respect to the plea.

9          THE COURT:  Okay, thank you.

10          MR. REITER:  Nothing further, your Honor.

11          THE COURT:  All right.  Any other questions,

12  any questions from you, Mr. Arnold?

13          THE DEFENDANT:  No, I am good.

14          THE COURT:  Okay.  All right.  So based upon

15  what I have heard today, the information given to me, I

16  find, Mr. Arnold, that you're acting voluntarily, that

17  you fully understand your rights and consequences of your

18  plea.  I also find there is a factual basis for that

19  plea.

20          I will therefore recommend that the district

21  judge accept the plea of guilty in this case.

22          Next, the question of bail.

23          MR. LETO:  Yes, your Honor.  We have an

24  agreement with all matters except one.

25          THE COURT:  Okay.

Transcriptions Plus II, Inc.

28

Proceedings

1          MR. LETO:  All right.  Do you want me to --

2          THE COURT:  Do you want to say what -- let's

3    say what the agreement is.

4          MR. LETO:  Okay.

5          THE COURT:  Okay.

6          MR. LETO:  The agreement is that Mr. Arnold,

7    subject to the Court's approval, of course, would be

8    released on a $100,000 unsecured bond, that his travel

9    would be restricted to New York State, Connecticut, New

10   Jersey and Pennsylvania and that he must surrender his

11   passport by February 16th.

12          It was my mistake, I told Mr. Reiter that I

13   should have told Mr. Arnold to bring his passport today,

14   but he will overnight it to me or if the Court prefers,

15   he can email it directly to pretrial either here or in

16   Connecticut, which will be the subject of the dispute but

17   other than that, I think we're in agreement.  So there's

18   just one thing left to go over.

19          THE COURT:  So what are we not in agreement of,

20   the surrender of his passport?

21          MR. LETO:  Pretrial services -- no, pretrial

22   services reporting is the only point of contention.

23          THE COURT:  Okay.  So what's the problem?

24          MR. LETO:  All right.  I'm all right with Mr.

25   Arnold reporting to pretrial services but in the

29

Proceedings

1   following manner.  I don't think there's any reason for

2   him to actually physically to have to go there and here's

3   why.  Most people don't bother to read 18 USC 3142.  If

4   they did, they would see that under 3142(b), the Court

5   shall release the defendant on personal recognizance or

6   an unsecured bond.

7           The only time a Court may impose conditions in

8   addition to that is if the Court feels that the release I

9   just mentioned will not reasonably assure the defendant's

10  return to court or the safety of the community.  I don't

11  think there's any basis here to think he will not come

12  back to court.

13          Now with respect to his international travel,

14  although it's not mentioned in the pretrial services

15  report, with the exception of Canada, Mr. Arnold has not

16  traveled in the last 20 years.  These were all vacations.

17  So the older ones are irrelevant.  He went a couple of

18  times.

19          Canada, he went to because it was part of his

20  job when he worked at the company, RMI.  He no longer

21  works there, so he has no reason to travel to Canada.

22  And even if he did, reporting to pretrial is not going to

23  have any effect on traveling.

24          So what is the reason for him to report to

25  pretrial?  There is none.  None.

Proceedings

1        THE COURT:  Well, let me just stop for a

2   second.  You've agreed that he's going to be restricted

3   to New York, New Jersey, Connecticut and Pennsylvania.

4        MR. LETO:  Yes.

5        THE COURT:  Okay.

6        MR. LETO:  Because he has no reason to go

7   elsewhere and if he wants to take a vacation, I will

8   notify the government, pretrial and make an application

9   to the Court.

10        THE COURT:  Right, right, okay.

11        MR. LETO:  Now --

12        THE COURT:  So in terms of reporting to

13   pretrial, is it because he has to report here?

14        MR. LETO:  He does not.

15        THE COURT:  In this district or what?

16        MR. LETO:  The nearest -- Ms. Mackey was kind

17   enough to say that Mr. Arnold could report in Connecticut

18   but the closest office is about a 40-minute drive.

19        THE COURT:  In Connecticut?

20        MR. LETO:  Yes.  I think it's best if he

21   reports by phone and this is an old form that you have in

22   front of you.  It doesn't contain email but he can report

23   by email, by telephone and if there should come a time

24   that he needs to report in person, for instance, we're

25   fine with home visits.  We crossed out employment visits

31

Proceedings

1    and Mr. Reiter was okay with that because I don't want

2    somebody showing up at his job and finding out why is

3    somebody from the federal government here checking up on

4    you.

5              THE COURT:  Right, but they come to his house

6    unannounced.

7              MR. LETO:  Yes, that's fine.

8              THE COURT:  How often does he have to appear

9    before pretrial?

10             MR. LETO:  Well, that's my point.  I don't

11   think he should have to appear at all but it's up to the

12   individual office --

13             THE COURT:  No, I mean even by phone or email

14   or whatever.  Like maybe we'll get Ms. Mackey up here to

15   weigh in.

16             MR. LETO:  If the Court does by phone or email,

17   as often as the Court and pretrial wants because it's

18   only a minor inconvenience.  He can send an email, make a

19   phone call, as often the Court and pretrial want.

20             THE COURT:  So he is still going to work every

21   day.

22             MR. LETO:  Yes.

23             THE COURT:  Okay.  Let me ask Ms. Mackey, how

24   often in a case like this would you ask for a defendant

25   to report?

32

Proceedings

1    PRETRIAL SERVICES OFFICER:  Well, if a

2    defendant was reporting to me for the first six months,

3    they report in person at least one time per month.  After

4    that, we can reduce it depending if the defendant has

5    been compliant to quarterly reporting.

6         THE COURT:  So when you say in person, how

7    often in person?

8         PRETRIAL SERVICES OFFICER:  Every three months

9    after the first six months.

10        THE COURT:  So he would only have to come twice

11   to here or to Connecticut?

12        PRETRIAL SERVICES OFFICER:  Four times a year.

13        THE COURT:  Or even twice and if in the first

14   six months you think well, it's fine you don't have to

15   come in anymore --

16        PRETRIAL SERVICES OFFICER:  Well, we -- if

17   we're --

18        THE COURT:  It's up to you really.

19        PRETRIAL SERVICES OFFICER:  Well, we like to,

20   for other districts, to put in as directed and have them

21   determine how often the defendant should report but if

22   your Honor wants him to report specifically, either by

23   telephone, in person, that's up to you.

24        MR. REITER:  Your Honor, the government's

25   recommendation is that Mr. Arnold be required to report

Proceedings

1   in person to pretrial services in Connecticut in his home

2   state.  We'd be fine with obviously whatever pretrial

3   services in Connecticut recommends and if I understood,

4   Ms. Mackey would be -- once a month for six months and

5   then after that on a quarterly basis.

6           PRETRIAL SERVICES OFFICER:  Correct.

7           THE COURT:  So he would only have to make one

8   trip in a six month period?

9           PRETRIAL SERVICES OFFICER:  No, the first six

10   months he would be reporting once a month in person.

11           THE COURT:  Okay.  So that's every month he has

12   to show up at the Connecticut office.

13           PRETRIAL SERVICES OFFICER:  Correct.

14           THE COURT:  Which is how far from his house?

15           PRETRIAL SERVICES OFFICER:  I am not a hundred

16   percent sure how far it is.  I think the closest office

17   is in Bridgeport, Connecticut from where he is.

18           MR. LETO:  I agree with that and it is

19   Bridgeport and according to Mr. Arnold, it's about a 40-

20   minute drive.

21           MR. REITER:  Your Honor, the government's

22   recommendation is based on that this report, at least in

23   the six months going forward would be helpful to ensure

24   that Mr. Arnold continues to abide by his cooperation

25   agreement.

34

Proceedings

1      THE COURT:  So as far as his cooperation

2  agreement goes, does he have to come and talk to you in

3  this office or somewhere else or what --

4      MR. REITER:  The cooperation agreement would

5  require him to talk to the government wherever is

6  necessary.  The government certainly -- able to come to

7  New York or Connecticut to meet with him or at times meet

8  over the phone, although the agreement does contemplate

9  that he might have to travel, as well.

10      THE COURT:  Right.  So to cooperate with the

11  cooperation agreement, he's got to meet with the United

12  States Attorney's Office and he's got to do that wherever

13  you say.  This issue is whether or not he has to apply --

14  go to pretrial to make sure that he is doing whatever he

15  has to do.  Right?

16      MR. LETO:  Yes, and part of --

17      THE COURT:  That's the difference.

18      MR. LETO:  -- my argument is though is since

19  there is going to be some monitoring by the government by

20  virtue of the cooperation agreement, there isn't any

21  necessity to pretrial as well and because he is a

22  cooperator, I am always reluctant to have more people

23  than are necessary to know what it is he is up to.  We're

24  going to be in a different pretrial services office.

25  That officer may decide you've got to come in once a

35

                         Proceedings

1   week.

2          But the point is this and I go back to 3142, if

3   you read the statute and abide by it, the only way this

4   Court can impose the conditions, if I object and I am, to

5   certain provisions is if you feel that without the

6   conditions it will not reasonably assure the safety of

7   the community and his return to court.

8          THE COURT:  Right.  So you're saying if we're

9   letting him out, there's no reason to believe he's not

10  going to also comply with whatever pretrial tells him to

11  do.

12         MR. LETO:  I'm saying that under the statute --

13         THE COURT:  Let's look at the bond.  Let me see

14  exactly what the bond says that we're agreeing to.  And

15  by the way, who is signing the bond?  Is it just the --

16  it's unsecured, right?

17         MR. LETO:  Yes.  Originally we (indiscernible)

18  but the government and I saw how much Mr. Arnold's

19  (indiscernible) we thought it might look better for 100,

20  even though to a certain extent it's a meaningless number

21  since he is not putting up anything.

22         THE COURT:  Right.  Ad the government is

23  agreeing with that?

24         MR. REITER:  The government would agree with

25  100,000 unsecured bond.

36

Proceedings

1          THE COURT:  An unsecured, so you're pretty
2   confident he is going to show up.

3          MR. REITER:  Well, your Honor, I was under the
4   impression that the bond will be signed by Mr. Arnold's
5   wife, is that correct?

6          MR. LETO:  I was not under that impression but
7   that's fine with us.

8          THE COURT:  Is she here?

9          MR. LETO:  Yes.

10          THE COURT:  Okay.

11          MR. LETO:  I kept her out because sometimes
12   it's not a good idea to have spouses in the courtroom
13   during an allocution.

14          THE COURT:  Okay.  All right.  So let's go
15   through this in particular.  So we have a bond.  It's
16   $100,000.  You agree to that.  He's remaining in -- his
17   travel is certainly restricted.  He's going to work every
18   day; Connecticut, Pennsylvania, New York, New Jersey.  He
19   has to surrender his passport and here's where we're
20   talking about.

21          MR. LETO:  Yes.

22          THE COURT:  He's under the supervision of
23   pretrial services, subject to special conditions on the
24   reverse.

25          MR. LETO:  And I left that blank -- no, I left

37

Proceedings

1    blank what --

2              THE COURT:  That's fine.  Okay.

3              MR. LETO:  I left blank the specifics with

4    respect to pretrial.  In other words, I could object bu

5    if it's not going to inconvenience him, I am not going to

6    object to pretrial per say, just to employment visits,

7    and having him to show up in person.

8              THE COURT:  You don't want an employment visit

9    though.

10             MR. LETO:  No employment visits.

11             THE COURT:  No employment visits.

12             MR. LETO:  Correct.

13             THE COURT:  And that's fine.  I agree with that

14   because that could certainly -- he's a cooperator.  You

15   don't want people showing up at his place of business

16   where he is working.

17             MR. LETO:  And so does the government, the

18   government also agrees to that.

19             THE COURT:  Everyone agrees to that.  And he's

20   got random visits at his home.

21             MR. LETO:  Okay with that.

22             THE COURT:  Okay with that.  And here's where

23   the part -- (b) says must report either as directed as

24   pretrial or in person certain times or by telephone.

25             MR. LETO:  And we can throw in email because

38

Proceedings

1   it's an old form, they don't have email on there.

2   Obviously the form is very old.

3           THE COURT:  Right.  So I mean the fact that

4   it's even in the form, it's interesting you bring it up

5   because it's always been in person, so -- but the form

6   certainly contemplates it could be done by telephone,

7   right?

8           MR. LETO:  Yes.

9           THE COURT:  Okay.  I want to be clear on where

10  he calls in and when he calls in and that would be

11  calling into -- Ms. Mackey to your office?

12          MR. LETO:  Whatever the government, the Court

13  and pretrial wants, he will do with respect to phone

14  calls and emails.

15          PRETRIAL SERVICES OFFICER:  He probably will

16  report to the Connecticut office by telephone then.

17          THE COURT:  Okay.  By telephone.

18          PRETRIAL SERVICES OFFICER:  Yes.

19          THE COURT:  Okay.

20          PRETRIAL SERVICES OFFICER:  Since they'll be

21  doing the home visits.

22          THE COURT:  And they'll be doing home visits.

23          PRETRIAL SERVICES OFFICER:  Correct.

24          THE COURT:  Okay.  Which is certainly something

25  that is more intrusive and Mr. Arnold, you have to

39

Proceedings

1   understand that they can show up at your door, any time,

2   unannounced and I don't know who else is living at your

3   house.  Your wife is there, she'll know.  Do you have

4   children there?  Do you have any other family members

5   there?

6              THE DEFENDANT:  Just two children.

7              THE COURT:  Just two children.  It's a single-

8   family home.  There's no other people living there.

9   Okay.  So you understand that and I am going to allow you

10  to appear by phone or email.

11             THE DEFENDANT:  Okay.

12             THE COURT:  You're going to have to set that up

13  with Ms. Mackey who will coordinate whatsoever she needs

14  to coordinate with the Connecticut office and they'll

15  tell you how to appear, okay?

16             THE DEFENDANT:  Okay.

17             THE COURT:  Now you have to understand the

18  conditions of this bond, when you sign it, you have to

19  comply by every one of these conditions, meticulously,

20  okay?  So if somebody tells you to call and email and you

21  don't do that, or if someone -- any of this, if you

22  travel to a different state that's not here or

23  internationally, or if you do anything that's not allowed

24  by here, that will subject you to be prosecuted for a

25  completely separate crime of bail jumping.  That is

Proceedings

1  separate, okay?

2         THE DEFENDANT:  Uh-hum.

3         THE COURT:  Now if you have any question at all

4  as to whether or not you can do something, supposing you

5  have a family reunion in Florida or something and you

6  think well, that's okay, it's in the United States, I

7  don't need a passport.  No, that's not on this piece of

8  paper.  So that means that you cannot do that without

9  permission.

10         So if you have any question at all as to

11  whether or not you can do something, you must consult

12  pretrial, right?  And if you have a request that you need

13  to do, maybe someone in your family is sick, who knows

14  what?  If you have a request to travel or anything like

15  that, you have to ask pretrial.  You have to give them

16  enough time to consider, if possible and then it has to

17  come a judge, either me or Judge Spatt, to say yes, you

18  can do it or no you can't or pretrial in many cases has

19  discretion to say yes, it's fine with us, just check in.

20  Okay?

21         THE DEFENDANT:  Okay.

22         THE COURT:  So it's important that you

23  understand that I am going to allow you to check in with

24  pretrial however many times they think, either by phone

25  or email, and if anything changes, pretrial can then come

41

Proceedings

1   and say do you know what?  This isn't working out, Judge.

2   I want to change this.  And if they come back to me or to

3   Judge Spatt or any other judge that's on duty and they

4   say this is not working out, we can't trust this person,

5   he hasn't called in, we need to change his conditions,

6   then we'll change them.

7          MR. LETO:  Your Honor, may I just have a moment

8   to say something?

9   (Counsel and client confer)

10         MR. LETO:  Thank you, your Honor.  I just

11  wanted to tell him something privately.

12         THE COURT:  Okay.  So let me ask Mr. Arnold, do

13  you have questions for me about the conditions of your

14  bond, the conditions of your release?

15         THE DEFENDANT:  No, I understand.

16         THE COURT:  You understand.  And you understand

17  the importance of complying with this?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Okay.  So I am looking at the form

20  now and when I am in (b) and I am checking must report,

21  we will just say as directed by pretrial by telephone,

22  right?  Now, pretrial, do you want me to put in any

23  particular times or it's just going to say as directed by

24  telephone or by email?  We'll do it that way?

25         PRETRIAL SERVICES OFFICER:  As directed by

42

Proceedings

1   telephone would be great, Judge.

2          THE COURT:  Okay.  So I am checking as directed

3   and I am going to give this back to you to look at before

4   I sign it again.

5          MR. LETO:  If your Honor wants Ms. Arnold to

6   sign the bond, I will get her.

7          THE COURT:  You know what?  Maybe -- I think

8   it's important that she understands, if she is living in

9   the same house.  She -- it's important that she knows

10  what's going on here, too.

11         MR. LETO:  Thank you, your Honor.  The postal

12  inspector is asking her to come in.

13         THE COURT:  I'm doing and/or via email because

14  that will be up to pretrial to decide how they want to do

15  it.  All right?  Because I don't know what their systems

16  are.

17         MR. LETO:  Yes, your Honor, that's fine with

18  us.

19         THE COURT:  I will give you back the bond.  Why

20  don't you come on up?

21         MR. LETO:  Come up to the right.

22         THE COURT:  That's fine.  Mrs. Arnold, is that

23  your last name, too?

24         MS. ARNOLD:  That's my last name.

25         THE COURT:  Okay.  And you're Mr. Arnold's

Proceedings

1   wife, is that right?

2          MS. ARNOLD:  I am.

3          THE COURT:  Okay.  So the reason I asked you to

4   come in is because the government is asking that you co-

5   sign the bond that your husband is signing and I want to

6   explain to you the conditions of that, just so you know

7   what's going on here, okay?

8          MS. ARNOLD:  Yes.

9          THE COURT:  So your husband is being let out on

10  bond.  Now that bond is unsecured but it is an unsecured

11  bond in the amount of $100,000.  If your husband doesn't

12  comply with all of the conditions of the bond, he's not

13  only going to be subject of the $100,000 but also he will

14  be charged with a separate crime of bail jumping.  And

15  I've explained all of that to him.

16          Now the part I want to also make clear to you

17  is that as part of the bond, pretrial services can visit

18  your home without notice.  I want you to know that

19  because it's your home, too and you'll be there and there

20  could be pretrial knocking on your door just to check on

21  your husband.  So I want you to know that that could

22  happen and not to be alarmed if that happens.

23          MS. ARNOLD:  Okay.  Can I ask a question?

24          THE COURT:  Absolutely.

25          MS. ARNOLD:  What would they perhaps say?  I

44

Proceedings

1   have a daughter with anxiety who is in therapy, so I

2   would like to prepare her.

3           THE COURT:  Fair enough bringing that up and

4   what I would ask you to do and I am glad you walked in

5   for that reason, before everybody leaves today, you're

6   going to talk to pretrial services and maybe you can  put

7   that in the file.  Ms. Mackey, would that be appropriate?

8           PRETRIAL SERVICES OFFICER:  That's fine, Judge.

9           THE COURT:  Okay.  How old are your children?

10          MS. ARNOLD:  Eleven -- she'll be twelve in

11  April and my son will be ten in two weeks, almost.

12          THE COURT:  Okay.  And I mean it's unlikely

13  that they're going to be home alone or answering the door

14  by themselves, right?

15          MS. ARNOLD:  My daughter has only stayed home

16  for like ten minutes at a time during the day.

17          THE COURT:  Okay.

18          MS. ARNOLD:  That's it.

19          THE COURT:  All right.  Well, that's precisely

20  the kind of thing you should talk to pretrial about, just

21  so that they're sensitive to that.  Okay?

22          MS. ARNOLD:  All right.

23          THE COURT:  But I do want you to know that

24  you're going to take a look at the bond.  Mr. Leto will

25  go over it with you.  You'll sign it.  Just high points

45

Proceedings

1  of that is, as I said, pretrial can visit your house.

2  Travel is restricted for your husband; New York, New

3  Jersey, Connecticut and Pennsylvania.  He's giving up his

4  passport, so he can't travel outside of the country.

5          And also, if there's some family event or

6  something he wants to travel, that involves travel

7  outside of those places, he cannot do any of that without

8  permission.  Okay?

9          MS. ARNOLD:  Right.

10          THE COURT:  So just so you know, if you're

11  making any plans, that if your husband wants to go

12  anywhere outside of those places, then he needs to have

13  special permission.

14          MS. ARNOLD:  So if he happened to get a job

15  interview somewhere else, he just needs to get permission

16  but he would be allowed to go.

17          THE COURT:  That's exactly the type of thing,

18  we would ask for permission for.  You could contact

19  pretrial.

20          MS. ARNOLD:  Okay.

21          THE COURT:  Sometimes they can grant it

22  themselves.  Sometimes they'll have to go to a judge and

23  say can this be granted.

24          MS. ARNOLD:  Okay.

25          THE COURT:  But, yeah, that's the kind of thing

Proceedings

1  you need to be aware of.

2          MR. LETO:  And, your Honor, just to assure Ms.

3  Arnold because she is quite nervous, these applications

4  are liberally granted by judges, provide the judges get

5  advance notice --

6          THE COURT:  Absolutely.

7          MR. LETO:  -- as opposed to after the fact,

8  trying to explain why the person went.

9          THE COURT:  After the fact explaining is never

10  a good idea --

11          MS. ARNOLD:  Okay.

12          THE COURT:  -- because then you've already --

13  not you --

14          MS. ARNOLD:  Right, right, right.

15          THE COURT:  -- then your husband will have

16  already committed a crime.

17          MS. ARNOLD:  Yes.

18          THE COURT:  All right.  But, yes, Mr. Leto is

19  right, I mean there could be a sick relative.  There

20  could be a graduation.

21          MS. ARNOLD:  Right.

22          THE COURT:  Things happen.

23          MS. ARNOLD:  Okay.

24          THE COURT:  Always ask.

25          MS. ARNOLD:  Okay.

47

Proceedings

1          THE COURT:  Even if it's vague and you're not
2    sure if it's something that's okay, it doesn't cost
3    anything to ask; always ask.
4          MS. ARNOLD:  Okay.  Thank you.
5          THE COURT:  Do you have any questions for me?
6          MS. ARNOLD:  Not that I can think of right now.
7          THE COURT:  Okay.
8          MS. ARNOLD:  Of course, is there a number you
9    can give me for when we leave?
10          THE COURT:  You'll have pretrial and the
11    lawyer, as well.  Mr. Leto is going to go over that with
12    you, as well.
13    (Pause)
14          THE COURT:  All right.  So we've gone over the
15    terms.  I am going to sign the bond.
16          Mr. Arnold, do you have any questions at all
17    bout the bond or you're good on it?
18          THE DEFENDANT:  I'm good, your Honor.
19          THE COURT:  Okay.  Again, call your lawyer.
20    You call pretrial if you have any questions at all.  Ms.
21    Mackey, anything else?
22          PRETRIAL SERVICES OFFICER:  I just want to put
23    on the record, your Honor, that Mr. Arnold would have to
24    go at least one time to the Connecticut pretrial office,
25    just to go over his reporting conditions --

48

Proceedings

1          THE COURT:  Just to establish it --

2          PRETRIAL SERVICES OFFICER:  Exactly.

3          THE COURT:  -- baseline.

4   (Counsel and client confer)

5          THE COURT:  Okay.  Mr. Arnold, that seems

6   appropriate.

7          MR. LETO:  One moment please, your Honor.

8          THE COURT:  Yes.

9   (Counsel and client confer)

10          MR. LETO:  Your Honor, we agree obviously that

11   that has to be done.  The only thing we're working on

12   because of his schedule, if pretrial in Connecticut

13   closes at 5, we're going to have to try to work something

14   out, say within the next week.

15          THE COURT:  Well work it out.

16          MR. LETO:  Because he is going to have --

17          THE COURT:  Just tell them you have to leave

18   work early or go into work late one day.  Just do it.

19   Make it happen.  People do things like that all the time.

20          MR. LETO:  Ms. Mackey is unsure what time

21   pretrial opens.  Maybe somebody is there at 8, and he can

22   do it before 8.  We're going to have to do it.

23          THE COURT:  Listen, everybody has to take off

24   work for one reason or another.  So just tell them --

25   make some excuse and make sure that you can get there

49

Proceedings

1  before pretrial closes.  People leave early all the time

2  from work.  You can do that.  Okay?

3          MR. LETO:  Yes, thank you, your Honor.

4          THE COURT:  You'll make it happen.

5          Anything else?

6          MR. REITER:  Yes, your Honor.  The government

7  would request a calendar control date for the fall for

8  this mater --

9          THE COURT:  Okay.

10          MR. REITER:  -- as opposed to a sentencing

11  date.

12          THE COURT:  So is that a date before Judge

13  Spatt?

14          MR. LETO:  Yes.

15          THE COURT:  June 1st?  Oh, he gave us that.

16  Okay.  Judge Spatt gave a date of June 1st at 9:30 before

17  Judge Spatt.

18          MR. LETO:  I'm sorry, what time your Honor?

19          THE COURT:  9:30 before Judge Spatt.  Okay?

20          MR. LETO:  Thank you, your Honor.

21          THE COURT:  Thanks.  Oh, wait.  Mrs. Arnold,

22  are you okay?

23          MR. LETO:  One moment, please, your Honor.

24          THE COURT:  Why don't you ask Mr. Leto.

25  (Counsel and co-signer confer)

50

Proceedings

1          MR. LETO:  I was just assuring Ms. Arnold that

2    there's really no chance that anything is going to happen

3    on that day, even if Judge Spatt wanted to sentence Mr.

4    Arnold, probation wouldn't be ready.  This is a

5    cooperation agreement.  We'll be lucky if there's a

6    sentence -- I shouldn't say lucky, I would estimate it's

7    unlikely there would be a sentencing this year but we

8    will inform Judge Spatt well before June 1st what our

9    plans are.

10          THE COURT:  Right. And so will the government.

11   We just have to set dates just to keep track of things

12   and sometimes it gets put off, you know, especially in

13   terms of cooperation.  It could take time, you know, for

14   the government to develop a case but we just have to put

15   that date.  So don't worry about it.  You'll know it way

16   in advance if it's going to happen and what's going to

17   happen, I am sure.  Okay?

18          Anything else from anybody?

19          MR. REITER:  No, your Honor, thank you.

20          THE COURT:  Okay.

21          MR. LETO:  Nothing else.  Thank you, your

22   Honor.

23          THE COURT:  Very good.  Thanks, very much.

24              (Matter concluded)

25                  -o0o-

51

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **1st** day of **March**, 2018.

*Linda Ferrara*
Linda Ferrara

AAERT CET**D 656
Transcriptions Plus II, Inc.